CASE 54—INDICTMENT.—NOVEMBER 24.

# Wigginton, &c., v. Commonwealth.

APPEAL FROM MONTGOMERY CIRCUIT COURT.

1. A CONFESSION OF THE ACCUSED out of court is competent evidence against him although it may have been procured by deception, but is incompetent if procured by promises, threats, or advice of the prosecutor or officer having him in charge, or of one having him in duress or having authority over him.

In this case a confession of the accused made by him under the influence of a threat of mob violence was incompetent evidence, but as there was evidence of distinct confession by him at other times when he was not apparently influenced by any promise, advice or threat, the incompetent evidence was not prejudicial.

2. A CONFESSION OF THE ACCUSED WILL AUTHORIZE HIS CONVICTION if accompanied with other proof that such an offense was committed. It is not necessary that the corroborative testimony should tend to connect the accused with the commission of the offense.

H. B. KINSOLVING AND WOOD & DAY FOR APPELLANTS.

A confession by the accused in the presence of an officer having him in charge and procured by threats or promise of immunity from punishment, is not competent evidence against the accused. (1 Greenleaf on Evidence, sec. 222; Roscoe's Criminal Evidence, 32; 1 Wharton's Am. Crim. Law, sec. 686; Young v. Commonwealth, 8 Bush, 366; Rector v. Commonwealth, 80 Ky., 468; Rutherford v. Commonwealth, 2 Met., 387; Young v. Commonwealth, 8 Bush, 386; Butler v. Commonwealth, 2 Duvall, 435; Hudson v. Commonwealth, 2 Duvall, 531.)

W. J. HENDRICK, ATTORNEY GENERAL, FOR APPELLEE.

No brief in record.

JUDGE LEWIS DELIVERED THE OPINION OF THE COURT.

Appellants, John L. Wigginton, father, and Charles and Frank Wigginton, unmarried sons, having been jointly indicted for murder of Buck Watts by poisoning, were convicted.

The deceased was at the time of his death living on and had management of a farm belonging to his father-in-law, Ferguson, and they with their wives occupied the same dwelling house.

That the death of Watts was caused by poison intentionally put into a coffee-pot from which he drank at breakfast is placed by the evidence beyond question. For of the three persons who on that occasion took coffee, all were immediately made sick, and Ferguson as well as Watts died next day, evidently of poison, while those, there being others at the breakfast table, who took no coffee, were not at all affected. Besides, though no scientific analysis was made, the presence of a substance like arsenic was afterward discovered in the coffee-pot. The testimony of Mrs. Ferguson is, that the coffee she made for supper the evening before was not entirely consumed, though drunk with impunity, and she left the grounds in the pot which were reboiled for the fatal breakfast. It is also shown that there was not at the time any poison about the house and, consequently, the arsenic which caused the death of Watts and Ferguson could not have been put into the vessel accidentally or by mistake.

It appears that the coffee-pot had been left during the night in the kitchen, to the outside door of which there was a latch but no fastening, and that appellants were well acquainted with the character and situation of the buildings and grounds, having lived and worked on the

Ferguson farm, though occupying another dwelling house, up to about two weeks before death of Watts.

The evidence also shows there was bad feeling on the part of each of the appellants toward deceased, growing out of dispute of what was due, if anything, to them for work they had done on the farm, and that distinct threats had been made against him by both Charles and Frank, while John L. had expressed dissatisfaction in strong terms at not himself being paid what he claimed was owing, and on one occasion said in substance that if deceased did not pay he would regret it, if not in this, in the next world.   It is proper to state in this connection that in a conversation between deceased and Charles a short time before the killing, that a witness present described as "rough talk," the former contended that after broken window-glass and rails burned, together with the loss he had sustained by their failure to work on the farm according to contract, were accounted for, he would not owe either of them anything.   The record shows appellants were thriftless, and being, as Charles told the deceased, out of food, they were sore and resentful at him for refusing to pay what they contended he owed them, and which they needed to buy something to eat.   It therefore seems to be sufficiently established that the accused had both the opportunity and motive for committing the crime with which they are charged.

But independent of confessions, the only circumstances proved which tend to connect them with the crime are, first, the presence of Charles on the farm and in the kitchen the day before; second, that a fire was made and noise heard by a neighbor at an unusual time, between 11 and 12 o'clock on the night before the killing, at the

house where appellants then lived, about two miles from the Ferguson farm, and third, that Charles the day before went to Mt. Sterling, which fact was in corroboration of his subsequent admission he at that time and place purchased the arsenic put into the coffee-pot. It is, therefore, manifest that the vital question in this case is whether the lower court properly permitted the alleged confessions proved.

It appears that soon after the deaths of Watts and Ferguson, three persons—peace officers—went from Mt. Sterling to the place where appellants then lived, two of the officers going to a field where Charles and Frank, together with two smaller brothers, were shucking corn. And upon one of the officers, the jailer, announcing that they had come there to arrest Charles and Frank for murder of Ferguson and Watts, one of the small boys threw up his hands and besought them for God's sake not to hang his old pap, who did not have anything to do with it, but would tell all about it. No protestation of innocence or explanation was then made by either Charles or Frank, although the same statement was several times made by their small brother, except that Charles said that when they got to his father, who was at their dwelling house, they would talk it over and tell all about it. It is further proved that on the way to Mt. Sterling, upon one of his small brothers urging Frank to tell all about it, he replied, "you tell," but finally stated that Charles went to Mt. Sterling with ten cents given by his father and purchased arsenic, and that he and Charles went to the Ferguson farm at night and while he stood outside Charles went into the kitchen and put the arsenic in the. coffee-pot.

On the same day after appellants had been carried to Mt. Sterling and put in jail, one of the officers, the jailer, accompanied by another person, returned to the Wigginton house in the country and had an interview with Mrs. Wigginton, in which he said to her that her husband had sent him there that she might tell all about the poisoning of Ferguson and Watts, and unless she did confess and tell about it they would all be hanged. He also told her that Charles, Frank and her husband had confessed. She then made a statement, which was not permitted to be proved, but as it turned out when she was afterwards confronted with Charles in jail, was a recital substantially like the account of the transaction Frank had given. The jailer admitted on the stand that his representation to Mrs. Wigginton was untrue in regard to the alleged message from her husband, and about all of them having confessed, and, therefore, whatever statement she made was evidently induced by falsehood and deception.

It appears that after the examining trial of appellants another person had an interview with Mrs. Wigginton at the place she was staying in the country, in which it is inferable she made a similar statement to him, but what influence he brought to bear on her does not appear. On the same day of, though subsequent to, that interview, Mrs. Wigginton was carried to the jail, and being told to repeat in presence of Charles what she had said in the interview with the witness, she did so; but Charles several times denied knowing anything about the poisoning. Though a few minutes after being told by Mrs. Wigginton there was no use denying it, as he knew he did it, he made a confession which was substantially the same as the account previously given by Frank. In her testimony

Wigginton, &c., v. Commonwealth.

on the final trial, however, Mrs. Wigginton stated that neither Charles nor Frank was absent from the house on the night in question; that no poison was brought to her house by Charles. She further stated that after the examining trial a mob came at night to the house at which she was staying in the country, took her from bed, tied a rope around her neck and told her Charles, Frank and her husband had confessed and if she did not tell all about the poison they would hang her, and she did then make a statement upon their promise to let her go. Her version of what took place in the jail is, that she told Charles that they had told her if she did not come and tell him to confess they would hang them all. Her testimony in respect to what occurred in jail is at variance with that of all others who were present. But we will consider the competency of the evidence of Charles' confession in jail upon the assumption that her statement is true.

It seems to be settled that it does not affect the competency of such evidence that the confession was procured by deception practiced upon the accused; much less would it be affected by deception of another person cognizant of the crime, though not accused. It has been held by this court that to render evidence of confession incompetent it must have been influenced by promises, threats or advice of the prosecutor or officer having the prisoner in charge, or of any one having him in duress or authority over him. (Young v. Commonwealth, 8 Bush, 366.)

While there is no proof of Charles having been influenced to make the confession on that occasion by any direct promise or advice by a person in authority, it seems

to us he must be regarded as having then made it under influence of a threat of violence to himself; for not only was Mrs. Wigginton's testimony about the manner in which she had been treated by the mob uncontradicted, but she further testified that before he made the confession she informed him she had been induced to come to the jail and advise him to confess, by a threat of the mob to hang them all if she did not do so. Consequently, if no other confession by Charles had been proved, the judgment against him would have to be reversed for the error of permitting that confession proved. But in addition to his conduct and conversation in the country when first arrested, which we regard as tantamount to a confession, there is evidence of distinct confession by him at other times than the one mentioned, and to more than one person when he was not apparently influenced by either promise, advice or threat. In fact the record before us, without regard to the alleged confession made at the suggestion of Mrs. Wigginton, places the guilt of both Charles and Frank beyond doubt.

It is, however, argued that independent of the confessions of Charles and Frank, which the jury was properly instructed not to consider against him, there was no evidence of the guilt of John L. Wigginton. Whether there was or not sufficient to authorize his conviction was for the jury to determine. It was shown that Charles is a person of less than ordinary sense, Frank having still less, and both are easily influenced and controlled, though each has enough capacity to know the difference between right and wrong; besides, on that question the jury was fully and correctly instructed. It therefore seems to us, living as they did with their father, dependent upon him

Wigginton, &c., v. Commonwealth.

.and subject to his influence as they must have been, it is not credible that Charles and Frank could have conceived, planned and carried out their murderous purpose, as was deliberately and skillfully done, without knowledge and connivance of their father. That he did know of their purpose and was aware of it being executed is shown by the noise heard and fires built up at his house at an un-usual hour of the night on which the poison was put by them in the coffee-pot, having to go more then two miles from home for the purpose. Moreover, when under arrest in another than the county where the crime was committed, he stated in language showing knowledge on the subject that Charles was the main one, which was corroborative of the account given by Charles and Frank, that Charles purchased and put the poison in the coffee-pot.

The lower court, in accordance with section 240, Criminal Code, which relates to confession out of court, gave to the jury the following instruction : " That a confession of either of the defendants will not warrant a conviction against the defendant making the confession, unless accompanied with other proof that such an offense was committed." But it is argued that the jury should have been further instructed that they had no right to convict unless such confession was corroborated by other evidence tending to connect the defendant with the commission of the offense, and that the corroboration is not sufficient if it merely shows the offense was committed and the circumstances thereof. And such appears to have been the ruling in Cunningham v. Commonwealth, 9 Bush, 149. But it now seems to us that as the instructions given in this case are fully and exactly what section

240 requires the court to tell the jury is the legal effect of evidence of confession out of court, it was not necessary or proper to indicate any other or further condition of their right to convict on such evidence.

Section 241, which relates exclusively to testimony of an accomplice, does prescribe the additional conditions mentioned, it being therein in terms provided that the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. But that section does not at all relate to confession of the accused out of court; and the fact of the two subjects being treated of in separate sections, and conditions being omitted from one, that are with evident care and particularity prescribed in the others, shows the Legislature for an obvious reason did not intend the testimony of an accomplice to have the same legal effect as evidence of confession by the accused out of court.

Perceiving no error of law as to instructions of the court, nor in any other respect affecting the substantial rights of appellants, the judgment is affirmed.